UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------

SHAUL HALEVI,                                    Case No.

        Plaintiff,

        v.                                       **COMPLAINT**
                                         **JURY TRIAL DEMANDED**

TOD JOHNSON,
THE NPD GROUP, INC., and
THE NPD GROUP OFFICER EARLY
RETIREMENT PLAN FOR OFFICERS
BASED IN THE UNITED STATES,

        Defendants.
-----------------------------------------------------

        Plaintiff Shaul Halevi, by and through the undersigned counsel, Law Offices of Alison

Greenberg, LLC, asserting claims against Tod Johnson, The NPD Group, Inc., and The NPD

Group Officer Early Retirement Plan for Officers Based in the United States, alleges as follows:

### INTRODUCTION

        1.      Mr. Halevi seeks relief pursuant to the Employee Retirement Security Act of

1974, as amended ("ERISA"), the Age Discrimination in Employment Act (the "ADEA"), the

New York City Human Rights Law and common law.

        2.      Just weeks from meeting the final criteria needed to attain the NPD early

retirement package (the "ERP"), Mr. Halevi was terminated by NPD and denied the ERP as well

as the standard twelve-month package routinely offered to officers who had served his length of

time with NPD.  This was the result of age discrimination and NPD's intention to interfere with

his rights to the ERP.

3.      Mr. Halevi had spent years overseeing NPD software releases, quality assurance, automation and internal systems, among other things.  He had successfully managed several departments, including PQM, ISA and PMO.  His work and oversight contributed extremely significant assets to NPD and NPD's customers.

4.      After Darren Person was hired to take the role of Chief Information Officer, Mr. Halevi was targeted, ignored, marginalized and ultimately replaced with younger, less experienced individuals, one of whom did not even have the requisite experience for the roles.

5.      Tod Johnson, NPD's Executive Chairman, had repeatedly made Mr. Halevi aware of the NPD ERP, which is routinely granted to those individuals who meet the specified criteria. Mr. Halevi met the criteria.

6.      NPD terminated Mr. Halevi's employment effective March 1, 2020 because his age -- 59-years old -- and the other criteria he met rendered him eligible to commence the ERP in April, 2020.  Mr. Halevi met all of the criteria in the "Plan Document for the NPD Officer Early Retirement Plan for Officers Based in the United States" effective 2015 (the "SPD"), a true copy of which is attached hereto as Exhibit A.

7.      Mr. Johnson, who is referenced in the ERP SPD as having decision-making authority, denied Mr. Halevi consideration to participate in ERP.  Mr. Johnson's behavior, and the behavior of other decision-makers, was arbitrary and capricious, and discriminatory.

8.      Among other things, Mr. Halevi seeks to compel his participation in the ERP to reward his positive and valuable performance as a key employee, as such Plan was an incentive to staying with NPD for the mandatory ten-year period.

9.      Each year, Mr. Johnson discussed the ERP with Mr. Halevi and other officers in the Officer Benefits meeting.  Mr. Johnson would also routinely meet with eligible Officers of

NPD who were approaching qualifying under the age and service criteria stated in the SPD in order to discuss the employee's "desire and intention to remain as active employees.  Where it is an Officer's intention to seek an early retirement option" certain events were supposed to take place in order to provide the opportunity for consideration by the employee and Mr. Johnson. None of this took place with respect to Mr. Halevi even though he met all of the criteria and his contributions to NPD surpassed many if not all of his predecessors.

10.     NPD instead terminated Mr. Halevi's employment.

11.     As is discussed herein, Mr. Halevi's termination was based on his age and was intended to and did interfere with him attaining the ERP.

## PARTIES

12.     Mr. Halevi resides in Melville, New York.

13.     Mr. Johnson resides in Scarsdale, New York.

14.     Defendant NPD's principal place of business is located at 900 West Shore Road, Port Washington, New York 11050, Nassau County.

15.     Upon information and belief, the Early Retirement Plan is self-funded by NPD.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction to hear this action pursuant to 28 U.S.C. § 1331 because claims in this action arise under ERISA and the ADEA.

17.     Venue is properly in the Eastern District of New York, Islip, because a substantial portion of the events occurred in Nassau County, New York.

## I.      Background

18.      Mr. Halevi was born in Israel on March 30, 1961.

19.      Mr. Halevi holds an MS degree in Computer Engineering from NYU - Polytech, and a BS degree in Electrical Engineering from CUNY.  Mr. Halevi has taken the Product Management Professionals ("PMP") Certification Course.  He took the "Agile Dev/OPS" Leadership Summit course in 2019 to concentrate on transforming to Agile and to learn about available technologies.

20.      Mr. Halevi began working for NPD in April 2009 as a full-time consultant.

21.      NPD is an expert in industry analysis and advisory services to help retailers and manufacturers identify market trends to make smarter business decisions.

22.      Even as a consultant, Mr. Halevi was charged with the design, development and build of an SDLC process (Software Release Life Cycle) as well as a Release Management System for the new NAV (a new data processing system for NPD data).

23.      From the start, Mr. Halevi's expertise, ingenuity and leadership were critical to NPD's success.

24.      Mr. Halevi typically worked in the Nassau headquarters of NPD.

25.      Mr. Halevi also traveled to and from, and worked in the Manhattan office of NPD, approximately once a month.

## II.     Mr. Halevi was Promoted Multiple Times at NPD and Routinely Excelled in his Leadership and Technical Roles at NPD Throughout his Employment

26.      Within just six months of providing services to NPD, Mr. Halevi designed, developed and delivered a completed Release Management process within BMC Remedy that included multiple modules and served numerous groups at NPD, including SYSDEV, DSI, QA, PMO and OPS.

27.     Following his success in accomplishing these projects in record time, Mr. Halevi was then asked to manage all releases and to monitor the system.

28.     In that first year, while demonstrating his technical and management skills, Mr. Halevi was asked to take on additional responsibilities, including the management of the QA department, which includes budgeting and management of personnel.

29.     Mr. Halevi was given a new position titled "Head of QA."

30.     Mr. Halevi worked tirelessly to build a better QA team and a release management team.

31.     Mr. Halevi became an employee with the title "Director" in November 1st,  2010.

32.     Mr. Halevi successfully managed the QA department, overseeing and implementing improvements across the board.  In addition, he built an automation team that transformed the archaic, manual work processes across the company saving time and money across various groups.  Overall, Mr. Halevi's innovations and leadership saved NPD many years in efficiencies.

33.     Mr. Halevi's record of accomplishments and transformation earned him a promotion to "Executive Director" in 2012.

34.      Mr. Halevi's department was renamed "Process and Quality Management," or "PQM."

35.     Mr. Halevi expanded the reach of the automation team to multiple departments and oversaw development of additional automated processes for RBG, Wal-Mart and Client Satisfaction.

36.     In 2012, Mr. Halevi and his team received the NPD "CEO award" for their improvements for the Client Satisfaction process.

37.     Mr. Halevi continued to diligently work on solving problems and challenges. He was even selected by Mr. Johnson to participate in the NPD prestige program (the" TJU") offered only to potential future leaders at NPD.  Mr. Halevi successfully completed the course.

38.     His successes resulted in his promotion to Vice President on July 1, 2014, only two years after his previous promotion, continuing to prove how valuable his work had been at NPD.

39.     In 2015, NPD faced challenges with its financial systems and reporting.  These areas were not under Mr. Halevi's purview.

40.     Tom Lynch, CFO, asked Mr. Halevi to participate in the FP&A weekly meetings to help identify solutions.

41.     Mr. Halevi participated and achieved significant improvements by simplifying and automating the weekly revenue reporting process (the "Gold File").  This created significant efficiencies for NPD.

42.     After several meetings, Mr. Halevi approached Mr. Lynch and explained the only way to resolve the problems was to create a new department to manage and govern the financial and business systems.

43.     Once the new ISA (Internal System Administration) department was created, Mr. Halevi was charged with its management as well.

44.     Given Mr. Halevi's successful management of multiple departments and the continuing contributions of his departments, Mr. Halevi was promoted to Senior Vice President in 2017.

45.     The 2017 promotion of Mr. Halevi was just two years after his previous promotion, demonstrating his positive leadership and contributions at NPD.

46.     Mr. Halevi managed his departments with great success, managing all business systems, introducing new enhancements and systems to save money and increase productivity for NPD.

47.     Mr. Halevi continued to work towards improvement and efficiency and in 2017 invited a consulting firm to educate and potentially transform the NPD IT department to "Agile," a method that adopted by major companies around the world.

48.     Transforming IT to the Agile methodology would require additional NPD resources and recruiting.

49.     Mr. Halevi's suggestion to adopt Agile was rejected by Mr. Halutz and other NPD executives who said that the expenses related to the transition were too costly.

50.     In September 2018, Mr. Halevi was asked to manage an additional department and become the head of PMO (Project Management Office) in addition to his other responsibilities.

51.     At the time, PMO was in disarray, not meeting most of its goals, and suffering from poor management and low morale.

52.     The head of that department had been let go.

53.     NPD asked Mr. Halevi to take on supervision of PMO, in addition to his other responsibilities, because of his positive record of accomplishments and management skills that earned him promotions throughout his time working for NPD.  The former CIO, the CHR and CEO set goals and objectives for him in supervising PMO.  Mr. Halevi's leadership over PMO significantly improved that department and he continued to successfully oversee PQM and BS as well.

**III.    Darren Person Commences Working for NPD in January 2019 and Perpetrates a Hostile Work Environment Against Mr. Halevi Based on Age**

54.    Darren Person joined NPD in January 2019 to transition to CIO to replace Mr. Halutz, who would eventually depart NPD on December 31, 2019.

55.    Mr. Person was in his early 40's.

56.    Mr. Halevi was 57 years old at the time, and turned 58 in March 2019.

57.    The arrival of Mr. Person marked the shift to marginalization of Mr. Halevi and interference with his role and reputation at NPD.

58.    Mr. Person routinely avoided and ignored Mr. Halevi.

59.    Mr. Person was dismissive of Mr. Halevi, downplaying his achievements and excluding him from most leadership conversations.

60.    Mr. Halevi was respectful to and supportive of Mr. Person.  He expressed his willingness to champion Mr. Person's new vison and did everything he could to ensure that Mr. Person understood that.

61.    None of Mr. Halevi's efforts to collaborate and work with Mr. Person were acknowledged or accepted.

62.    Mr. Person not only ignored and was dismissive of Mr. Halevi, he engaged in a series of actions aimed at undermining Mr. Halevi in the eyes of NPD employees and leadership, which would ultimately culminate with termination just as Mr. Halevi was on the cusp of being able to benefit from the ERP.

63.    Some of Mr. Person's actions were "micro-aggressions" but all of the negative behavior in the aggregate created a hostile work environment based on Mr. Halevi's age, even when Mr. Halevi was not aware at that time that NPD would ultimately replace him with two

8

younger men after he received a very positive performance review for 2019, exceeding expectations.

64.     The NPD leadership treated Mr. Halevi differently, showing contradictory behavior.

65.     All of this negative and contradictory behavior was very concerning to Mr. Halevi and created significant stress.

66.     First, in 2019, Mr. Person pushed NPD to adopt Agile and the leadership accepted his efforts even though they had rejected Mr. Halevi's earlier efforts to adopt Agile.

67.     In another example, Mr. Person publically announced that Agile certifications that had been earned by Mr. Halevi's team members in preparation for the Agile transformation were "not important" and a "waste of money."  This was unjustified and demeaning.

68.     Next, Mr. Halevi's efforts, while working under the direct instructions of CEO Karyn Schoenbart to enhance Salesforce, were dismissed by Mr. Person.  Mr. Person claimed that putting the enhancements in Salesforce was "tying" NPD to Salesforce.

69.     Mr. Halevi was actively involved in and participated in many of the internal NPD meetings with the Procurement team regarding the Salesforce negotiations.  Mr. Person was in some of those meetings.

70.     Mr. Person told the NPD people that only he should be in contact with Salesforce for the actual negotiations.

71.     In another incident, Mr. Halevi met with Mr. Person in June 2019 for a "1-1" meeting.  Mr. Person raised the issue of the future of the PMO department.

72.     By way of background, in 2018, when Mr. Halevi was asked to assume oversight of PMO, he was asked by CHR Virginia Grande and Ms. Schoenbart to cut $350,000 in

personnel, implying that he could not hire additional resources, such as a VP to replace the person who had been terminated in that position.  Now, in 2019, Mr. Person suggested that they hire a VP for PMO, taking direct responsibility from Mr. Halevi.  Mr. Halevi was surprised, telling him about how he had been told to make significant cuts in PMO the year prior and concluded that it was not feasible to hire a VP.  By the end of the discussion, Mr. Halevi said he agreed with Mr. Person that hiring a VP for PMO made sense.

73.   Mr. Person did not reveal that he had already started the interview process of the VP of PMO, involving multiple senior NPD people.

74.   Having Mr. Person tell him they needed to hire a VP for PMO left Mr. Halevi concerned.  He had not received negative feedback but he was feeling cut out of the loop and ignored by Mr. Person.

75.   As a result of Mr. Person's negative behavior towards him, on or about June 13, 2019, Mr. Halevi met with Virginia Grande, Chief Officer of Human Resources.  He complained about how he was being treated negatively by Mr. Person, including being ignored and having changes made in management oversight.  He asked her whether this was a negative reflection on his performance.

76.   Ms. Grande said that the decision to hire a VP for PMO did not relate to Mr. Halevi's performance.

77.   Mr. Halevi also spoke to Mr. Lynch about the events and expressed his concerns about his treatment by Mr. Person.  Mr. Lynch assured him that "it will work out."

### IV.    Mr. Person Hires a VP PMO Without Mr. Halevi's Input, Removes Mr. Halevi from the Reporting Line, and Continues to Marginalize and Demean Mr. Halevi

78.    A few weeks later, Mr. Person hired a new VP for the PMO group.  Mr. Person did not inform Mr. Halevi about the hire, even though this person should presumably report to Mr. Halevi.

79.    Mr. Person's assistant sent an email asking Mr. Halevi to build the new VP's onboarding timeline.  This is how Mr. Halevi learned a new VP was selected and hired. He also learned from the announcement about the new VP that that position was no longer reporting to him, and instead was reporting directly to Mr. Person.

80.    Mr. Halevi asked to meet with Mr. Lynch to discuss these new developments, but he said he was in Europe the following week and unavailable.

81.    Given how he was being mistreated, Mr. Halevi decided he wanted to pursue the ERP that Mr. Johnson talked about each year in the Officer Benefits meetings.

82.    On September 27th, Mr. Halevi met with Melissa Sparr, who handled benefits in HR, to discuss his options for early retirement.

83.    Ms. Sparr said that Mr. Halevi needed ten years of employment with NPD and she had never seen a case where someone Mr. Halevi's age (58) had served less than ten years and received the package.

84.    Ms. Sparr suggested that he speak with Ms. Grande, the Chief of HR.

85.    After the new VP of PMO was hired, Mr. Halevi learned that several people had interviewed her but he had been totally excluded from the process.

86.    Mr. Halevi tried to meet with Ms. Grande to discuss the situation, but like Mr. Lynch, she said she would be out the following week.

87.   Mr. Halevi met with Ms. Grande on October 7, 2019.  He discussed his concerns, including the personnel changes that Mr. Person was making, and that Mr. Person had repeatedly dismissed the importance of his work, was not sharing important information with him, and was excluding him from executive meetings and discussions.

88.   Mr. Halevi pointed out to Ms. Grande that he was close to ERP eligibility (60 years old and at least ten years with NPD), turning 59 years old in March 2020, and considering Mr. Person's mistreatment of him, he would like to have more information about the ERP option. She said she would speak to Mr. Person and that Mr. Person would speak with Mr. Halevi.

89.   Ms. Grande should have known that speaking to Mr. Person and revealing Mr. Halevi's complaints violated basic HR principles in these situations, encouraging increased negative behavior against Mr. Halevi.

90.   Mr. Halevi had two "1-1" meetings with Mr. Person and Mr. Person never addressed the ERP.

91.   In Oct 2019, Mr. Person posted in the NPD "Insider" newsletter about the successful Salesforce contract negotiations.  "Insider" is a platform distributed to the entire company.  In another example of Mr. Person's effort to diminish Mr. Halevi's standing at NPD, and marginalize him, Mr. Person thanked specific people and deliberately excluded Mr. Halevi even though he had also participated in the negotiations.

92.   After he was terminated, NPD's attorneys claimed that Mr. Halevi was not included in the note because he was not on the Procurement team.

93.   But two of the people recognized by Mr. Person on the important Saleforce negotiation, Lori Garber and Peter Breglio, were also not on the Procurement team, and yet they were acknowledged.  Mr. Breglio even reported directly to Mr. Halevi.

94.     Mr. Halevi's exclusion from the important Salesforce "thank you" announcement was glaring and another sign of Mr. Person's hostility towards him.

95.     Mr. Person still had never provided any negative feedback to Mr. Halevi.

96.     In fact, in their October 28, 2019 "1-1" meeting, Mr. Person kept saying that Mr. Halevi was doing a "great job" and should continue to "do what you are doing."

97.     Mr. Halevi asked if he needed to do anything different and Mr. Person said, "no."

98.     In the fourth quarter of 2019, Mr. Halutz gave Mr. Halevi his 2019 annual performance review.  Mr. Halutz gave Mr. Halevi a "4" rating out of "5" for the 2019 performance review."  The "4" is for "exceeds expectations."  This pertained to Mr. Halevi's supervision and management of his three departments.

99.     Thus, not only did Mr. Halevi achieve the goals and objectives– he exceeded them.

100.    His accomplishments were recognized by Mr. Halutz and Mr. Person.

101.    Mr. Person, who was replacing Mr. Halutz, submitted the written 2019 performance rating to Mr. Halevi as the "evaluator."

102.    Some highlights from Mr. Halevi's 2019 review include:

   a.   "You do a good job documenting what was done against the objectives. Good support for Darren on boarding."

   b.   "Impressive job on improving the upgrades, and project management as well as with ISA, and PQM."

   c.   "Nice on savings. nice 97% on delivery KPI's, good improvement in QA."

   d.   "There were clearly a number of great achievements this year."

   e.   "You had a good year in terms of accomplishments against your objectives."

103.    Even though Mr. Halevi received a very positive review for 2019, he learned that he was not receiving a bonus or a raise commensurate with the "4" rating.

104.    He asked Mr. Halutz, who was still with NPD and his direct supervisor, why he did not receive bonus or a raise commensurate with the "4" rating.

105.    Mr. Halutz told him that Ms. Schoenbart and Ms. Grande were asking Mr. Halutz to lower Mr. Halevi's performance rating from a "4" to a "3."

106.    Mr. Halutz said he refused, noting that Mr. Halevi had met all of his objectives and had exceeded expectations.

107.    Ms. Grande said to Mr. Halutz, "we don't know what we will do with [Mr. Halevi] next year.

108.    Mr. Halutz told Mr. Halevi that Mr. Person agreed that Mr. Halevi was a "4" and not a "3."

109.    Mr. Halevi had not received any negative feedback from Mr. Halutz or Mr. Person, the people that he reported to.

**V.    NPD Hires A Less Qualified and Younger Person to Assume Mr. Halevi's Roles of Head of PMO and BS, Demonstrating that This was a Replacement, Not a "Restructure" or "Elimination of Position"**

110.    During the week of February 17, 2020, Mr. Person sent a memo to the Global IT group and officers at NPD stating he had hired Rafael Herrera to head the PMO.

111.    Mr. Herrera is younger than Mr. Halevi.

112.    Mr. Herrera was hired as SVP.

113.    Mr. Herrera told NPD employees that he had no previous experience relevant to overseeing Business Systems or PMO, two of Mr. Halevi's departments.

**VI.     Darren Person Terminates Mr. Halevi and NPD Does Not Offer Mr. Halevi the Standard Separation Package; In Response to an Attorney Inquiry, NPD States that Mr. Halevi was Not Entitled to the Early Retirement Package in April 2020**

114.    On February 20, 2020, Mr. Halevi met with Mr. Person and HR.

115.    Mr. Person said that due to a "restructuring," NPD was "eliminating" Mr. Halevi's position.

116.    Although Mr. Person had treated Mr. Halevi terribly for months, condoned by other senior leadership, this was a devastating and shocking outcome for Mr. Halevi after all of the years of valuable, exceptional service he provided to NPD, particularly because there was no mention of the ERP.

117.    Mr. Person sent a memo by e-mail four hours later to NPD's Officers and Global Technology, announcing that Mr. Herrera would manage the Business Systems and PMO groups, Hal Danziger would oversee the PQM group, and Mr. Halevi would leave NPD.

118.    This memo announcement was embarrassing to Mr. Halevi and was handled extremely poorly by the company.

119.    The "restructure" was a pretext.

120.    Mr. Herrera is younger than Mr. Halevi.

121.    Mr. Herrera has an accounting background but did not have background in the areas for these leadership roles.

122.    Mr. Herrera told people at NPD that he lacked experience in "systems," which is a fundamental foundation for Business Systems and PMO.

123.    Mr. Halevi had just received an "exceeds expectations" review and was clearly more than qualified for each of his roles.

124.    Mr. Halevi was escorted to his office by HR, was asked to leave his badge and computer and to leave the building, as if he was terminated for cause.  He was told that his personal property would be shipped to him.

125.    He clearly was not treated with the courtesy of a retirement or even a "restructure."

126.    This treatment was extremely embarrassing and upsetting to Mr. Halevi who had worked so hard for NPD and has always taken great pride in his reputation.

127.    HR did not mention the ERP, implying it was not an option.

128.    NPD did not even offer Mr. Halevi the standard separation package that officers of his tenure receive, each year.

129.    NPD terminated his medical benefits a week later, whereas the severance and ERP packages would have provided ongoing medical coverage for Mr. Halevi and his family.

130.    NPD sought to interfere with Mr. Halevi reaching the final vesting term.

131.    Mr. Halevi would have been eligible for the ERP in April 2020.

**VII.    Reasonable Reliance Created by Tod Johnson's Repeated Representations**

132.    Typically, Mr. Johnson held an Officer Benefits meeting, inviting all officers at NPD.  Mr. Johnson would discuss the officer benefits package for the current year.  Mr. Halevi started to attend those meetings in 2014.

133.    Mr. Johnson would address the applicable percentage to apply to the LTI bonus and the ERP package in general, and would announce that he would contact all people that were to be eligible in the coming year.

134.    Mr. Johnson always mentioned the combination of years of service plus age needed to equal at least seventy (70).

135.    Mr. Johnson would answer any specific questions.

136.    In Mr. Halevi's more than years at NPD, he had never heard of anyone being denied the ERP.

137.    If NPD wants the employee to stay, and the employee agrees, they defer the ERP discussion to a later date and the employee continues working for NPD.

138.    If NPD wants the employee to stay and the employee wants to leave, NPD grants the ERP benefit, the plan document is executed and the employee and NPD agree on a retirement date.  NPD might pay extra money to the employee for additional hours to be worked as a consultant.

139.    Sometimes, NPD has used the ERP to push out officers, including those who might not seem to be contributing.

140.    Mr. Halevi was aware of a situation where an NPD officer wanted to resign and go work for another company.  He was able to resign and get the ERP.

141.    Upon information and belief, four or five officers received the ERP package in recent months leading up to Mr. Halevi's termination.  Mr. Halevi does not have those names as NPD took back his work computer.

142.    Mr. Johnson did not follow the procedure with Mr. Halevi, not even after Mr. Halevi spoke with Ms. Grande in October about this specific request to pursue the ERP and she gave him the ERP SPD.

143.    Even though Ms. Grande told Mr. Halevi that she would discuss it with Mr. Person, he never mentioned the ERP to Mr. Halevi in their multiple meetings leading up to his termination.

144.    The leadership at NPD was aware that Mr. Halevi would become eligible for the ERP in April 2020 and this is why NPD terminated his employment in late February 2020, effective March 1, 2020, to interfere with the attainment of that benefit package.

145.    This unusually negative separation treatment for Mr. Halevi and interference with benefits he had earned that were routinely awarded to officers at NPD was also due to retaliation because, as discussed above, Mr. Halevi had complained to HR and Mr. Lynch about how he was being treated by Mr. Person and Mr. Person was made aware of his complaints and interest in the ERP.  Ms. Grande said to Mr. Halevi on October 7, 2019 that she was going to speak to Mr. Person about the discussion regarding the ERP.  She likely told him the other details of the conversation.

146.    According to the SPD, Mr. Halevi earned the NPD Early Retirement Package. (Exhibit A, .p. 2, Section A). He was an officer with an L2 designation level, he had been an officer for a minimum of three consecutive years, he was turning 59 (birthday March 30, 1961), and thus at least 55 and less than 65, and would make the ten-year service requirement on April 20, 2020.

147.    Had NPD not denied Mr. Halevi's right to the earned retirement benefit, he would be entitled to a package of at least $463,592, plus any future earnings resulting of sales of parts of the company or its entirety, comprised of the following components:

| | |
|---|---|
| $230,000 | Three years of 1/3 of yearly salary |
| $163,300 | Full medical coverage until age 65 (at the COBRA rate) |
| $ 17,708 | F20 Annual Targeted bonus, prorated (2020) (This can be doubled depending on the performance rating). |
| $ 51,611 | LTI, prorated (2020) |
| $    973 | Annual OWAP |

148.     Pursuant to the ERP, Mr. Halevi is also is entitled to the percentage of earnings of any sale of NPD businesses or the sale of the entire company during 5 years from execution of the ERP, which could be hundreds of thousands of dollars for Mr. Halevi.

**COUNT I**
**(Violations of ERISA § 502(a)(1)(B),**
**29 U.S.C. §1132(a)(1)(B) Against NPD and the Plan)**

149.     Mr. Halevi repeats the preceding allegations as if set forth more fully herein.

150.     Mr. Johnson is identified in the ERP SPD as being an initial decision-maker for an employee to be able to opt for the ERP.

151.     Each year, Mr. Johnson called an officer benefit meeting, to which Mr. Halevi was invited to attend.

152.     Mr. Johnson discussed the officer benefits, including the ERP.

153.     Mr. Halevi relied on what Mr. Johnson said in those meetings in believing he would be eligible for the ERP in April 2020 given the criteria that Mr. Johnson discussed.

154.     Mr. Halevi has standing to pursue benefits and other remedies because he met the eligibility criteria to be a participant under the Plan.

155.     Mr. Johnson did not abide by the 2015 Plan document and did not give Mr. Halevi the ability to opt for the early retirement package even though he was eligible.

156.     By reason of the foregoing, Mr. Halevi hereby seeks equitable relief against NPD and the defendant ERP, including declaratory and injunctive relief, including but not limited to participation in the ERP with all benefits therein, plus attorneys' fees and costs

**COUNT II**
**(Violations of ERISA § 502(a)(1) and 502(a)(3),**
**29 U.S.C. §1132(a)(1) – Breach of Fiduciary Duty)**

157.     Mr. Halevi repeats the preceding allegations as if set forth more fully herein.

158.     During the relevant time period, Mr. Johnson was a fiduciary under the ERP.

159.     According to page one of the ERP SPD (Exhibit A hereto), participation in the ERP Plan was subject to Mr. Johnson's discretion.

160.     The effective date of early retirement for the participant was subject to NPD approval. (Exhibit A, page 2).

161.     Eligible officers were routinely granted the ERP, whether they wanted to retire at that time or postpone, or if they wanted to leave NPD and work elsewhere, or even if they were asked to leave due to performance issues.

162.     Mr. Johnson owed Mr. Halevi a fiduciary duty.

163.     Mr. Johnson was required to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man" would use.

164.     Mr. Johnson had a duty to act as a "prudent man" and discharge his duties "with respect to the [Early Retirement Plan] solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries."

165.     Such fiduciary obligations under ERISA are described as the "highest known to the law."

166.     Mr. Johnson breached his fiduciary duty in failing to consider and confer on Mr. Halevi the ERP even though he was eligible in April 2020.

167.      Mr. Johnson's behavior caused prejudice to Mr. Halevi.

168.	Mr. Halevi has been damaged as a proximate result of Mr. Johnson's breach of fiduciary duty.

169.	By reason of the foregoing, Mr. Halevi hereby seeks equitable relief against NPD and the defendant ERP, including declaratory and injunctive relief, including but not limited to participation in the ERP with all benefits therein, plus attorneys' fees and costs.

**COUNT III**
**(Violations of ERISA § 510, 29 U.S.C. § 1140)**

170.	Mr. Halevi repeats the preceding allegations as if set forth more fully herein.

171.	ERISA Section 510, 29 U.S.C. §1140 provides as follows:

> It shall be unlawful for any person to discharge, fine, suspend, expel, decline or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this title, section 3001 [29 U.S.C. § 1201], or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this title, or the Welfare and Pensions Plan Disclosure Act.

172.	Mr. Halevi is and was a "participant" within the meaning of ERISA §1002 as he was an employee who is or was to become eligible to receive the ERP benefit.

173.	Upon termination, Mr. Halevi remained qualified to be the head of PMO, Business Systems and PQM.

174.	Mr. Halevi was in a protected group because he (1) met the criteria of his officer designation level, (2) had been an officer for at least three consecutive years, (3) was at least 55 and less than 65 years of age, (4) had a minimum of ten years of NPD qualified service, and (5) would have a combined total of age and service of not less than 70 years in April 2020 if his consultancy time with NPD counted, and January 2021 if his consultancy did not count.

175.    Multiple people at NPD had knowledge that Mr. Halevi wanted to pursue the

ERP.

176.    Before he was terminated, Mr. Halevi notified Ms. Sparr, Ms. Grande, Mr. Halutz

and other NPD employees that he wanted to pursue the ERP.

177.    Ms. Grande said she would speak to Mr. Person about his interest in the ERP.

178.    Ms. Grande likely notified Mr. Person about the discussion that took place on

October 7, 2019 as she said she would speak with him about the ERP.

179.    By terminating Mr. Halevi effective March 1, 2020, when he was to vest in the

Early Retirement Plan in April 2020, Defendants engaged in prohibited conduct.

180.    Even if his early time with NPD as a consultant does not count towards the ERP,

which Mr. Halevi denies as the SPD only requires "qualified service" and does not require

employment rather than consultant service, he would have qualified for the ERP in less than a

year after termination of his employment.

181.    In either case, NPD was motivated, at least in part, to interfere with Mr. Halevi

receiving the ERP.

182.    The reason given for termination -- that there was a "restructuring" and his

position was "eliminated" --  was a pretext.

183.    After Mr. Person and Mr. Halutz gave Mr. Halevi "exceeds expecations" for his

2019 annual performance review, NPD terminated and replaced Mr. Halevi with two younger

individuals.  One of those individuals, Mr. Herrera, lacked the background to oversee Business

Systems and PMO.  Thus, this was not a legitimate "restructuring" or "elimination of position."

184.     By reason of the foregoing, Mr. Halevi hereby seeks equitable relief against NPD and the defendant ERP, including declaratory and injunctive relief, including but not limited to participation in the ERP with all benefits therein, plus attorneys' fees and costs.

## COUNT IV
### (Promissory Estoppel- Early Retirement Plan)

185.     Mr. Halevi repeats the preceding allegations as if set forth more fully herein.

186.     NPD caused Mr. Halevi to believe he would be eligible for an early retirement package because he met the criteria of his officer designation level, had been an officer for at least three consecutive years, was at least 55 and less than 65 years of age, had a minimum of ten years of NPD qualified service, and would have a combined total of age and service of not less than 70 years.

187.     Every year, close to December, Mr. Johnson would hold an Officer Benefits meeting, inviting all officers at NPD to review and discuss the Officer benefits package for the current year.

188.     Mr. Johnston specifically addressed: (a) the applicable percentage to apply to the LTI bonus, and (b) the ERP package in general, announcing that he would contact all people that are to be eligible in the coming year.

189.     Mr. Johnston always mentioned the combination of years of service plus age needed to equal at least seventy (70).

190.     Mr. Johnston would also answer any specific questions.

191.     In Mr. Halevi's more than ten years at NPD, he has never heard of anyone being denied the ERP.

192.     Sometimes, NPD even uses the Early Retirement Package to push out officers who might not seem to be contributing.

193.     While NPD now says that only his years of employment would count towards the ERP, even the SPD does not specify "employment" but instead uses the term "service."

194.     Mr. Halevi told Mr. Halutz and other employees that given Mr. Person's mistreatment of him, he was only staying NPD for the ERP, which he expected to receive.

195.     In reliance on the ERP, Mr. Halevi continued to work for NPD, even after Mr. Person implemented a campaign of marginalization, condescension and was pushing Mr. Halevi out.

196.     Had Mr. Halevi known that NPD was not going to honor the ERP or severance policy as to him, even though NPD routinely offered both to people who like him was eligible, he would have left NPD earlier.

197.     Mr. Halevi's reliance was reasonable.

198.     Mr. Halevi has been damaged as a result of NPD's breached promises.

199.     By reason of the foregoing, Mr. Halevi hereby seeks payment from NPD of the Early Retirement Plan with all benefits therein, plus attorneys' fees and costs.

**COUNT V**
**(Promissory Estoppel –Severance Policy)**

200.    Mr. Halevi repeats the preceding allegations as if set forth more fully herein.

201.    Mr. Halevi's former supervisor, Mr. Halutz, who was Chief Information Officer, told Mr. Halevi that it is customary at NPD for Officers who are let go with about 10 years of service at NPD, without cause, to receive a severance package equal to a full year of salary, twelve months of benefits, bonus, LTI bonus, and all work equipment and devices.

202.    This practice continued even after Mr. Person joined NPD

203.    In reliance on the representations made by Mr. Halutz and NPD, Mr. Halevi continued to work for NPD, even after Mr. Person implemented a campaign of marginalization, condescension and was pushing Mr. Halevi out.

204.     Had Mr. Halevi known that NPD was not going to honor the ERP or severance policy as to him, even though NPD routinely offered both to people who like him was eligible, he would have left NPD earlier and could have sought and found comparable compensation elsewhere.

205.    Mr. Halevi's reliance was reasonable.

206.    Mr. Halevi has been damaged as a result of NPD's breached promises.

207.    By reason of the foregoing, Mr. Halevi hereby seeks payment from NPD of a full year of salary, full year of benefits, bonus, and LTI bonus, plus attorneys' fees and costs.

## COUNT VI
### (Violations of ADEA and Hostile Work Environment Based on Age)

208.    Mr. Halevi repeats the preceding allegations as if set forth more fully herein.

209.    During the relevant time period, Mr. Halevi was 40 or older and thus in a protected class under the ADEA.

210.    Mr. Halevi is older than Mr. Person.

211.    During the relevant time period, Mr. Halevi was 58 years-old, and on the verge of turning 59.

212.    Mr. Person's constant campaign against Mr. Halevi, marginalization of and humiliation of Mr. Halevi were severe or pervasive.

213.    Such severe or pervasive behavior was due to Mr. Halevi's age.

214.    Mr. Person's mistreatment of Mr. Halevi based on his age was willful and wanton.

215.    NPD terminated Mr. Halevi's employment in February 2020 because of his age.

216.    Age was the "but for" reason for his termination.

217.    Mr. Person and Mr. Halutz rated Mr. Halevi with a "4" for "exceeds expectations" for his 2019 performance review, overseeing three groups, which rating was given just a few months prior to termination.

218.    The "restructure" and "elimination of position" excuses were pretextual.

219.    Hal Danziger is in his early 40's.

220.    Mr. Danziger was given the additional responsibility to manage PQM.

221.    Mr. Danziger had only been working for NPD for 11 months when he was given the added responsibility to manage PQM.

222.    Mr. Herrera is younger than Mr. Halevi.

223.     Mr. Herrera was hired as SVP a week before NPD terminated Mr. Halevi's employment.

224.     Mr. Herrera told NPD employees that he had no relevant previous experience to oversee Business Systems and PMO, two of Mr. Halevi's departments.

225.     Mr. Halevi has been damaged as a result of NPD's conduct and the damage is continuing.

226.     He seeks back pay, front pay, emotional distress damages, punitive damages, attorney's fees and costs and interest.

## COUNT VII
### (Violations of New York City Human Rights Law-
### Discrimination based on Age)

227.     Mr. Halevi repeats the preceding allegations as if set forth more fully herein.

228.     During the relevant time period, Mr. Halevi was 58 years-old, and on the verge of turning 59.

229.     Mr. Halevi is older than Mr. Person.

230.     Mr. Person treated Mr. Halevi worse than younger employees who were similarly situated.

231.     Mr. Person's mistreatment of Mr. Halevi based on his age was willful and wanton.

232.     NPD terminated Mr. Halevi's employment in February 2020 because of his age.

233.     Mr. Halevi received "exceeds expectations" for his 2019 performance review, given just a few months prior to termination.

234.     The reduction in force and elimination of position excuses were pretext.

235.     Hal Danziger is in his early 40's.

236. Mr. Danziger was given the additional responsibility to manage PQM.

237. Mr. Danziger had only been working for NPD for 11 months when he was given the added responsibility to manage PQM.

238. Mr. Herrera is younger than Mr. Halevi.

239. Mr. Herrera was hired as SVP a week before they let Mr. Halevi go.

240. Mr. Herrera has no previous experience relevant to overseeing Business Systems and PMO, two of Mr. Halevi's departments.

241. Mr. Halevi was treated less well than Mr. Herrera and Mr. Danziger by Mr. Person and HR because Mr. Halevi was significantly older.

242. There was no rational reason for Mr. Halevi's termination from employment given his consistently positive performance, lack of negative reviews and the fact that he was replaced by younger people, each with less experience than him, and that it would take multiple people to do his supervisory work.

243. Mr. Halevi has been damaged as a result of NPD's conduct and the damage is continuing.

244. He seeks back pay, front pay, emotional distress damages, punitive damages, attorney's fees and costs and interest.

## COUNT VIII
### (Retaliation – Title VII )

245.     Mr. Halevi repeats the preceding allegations as if set forth more fully herein.

246.     Mr. Halevi complained to HR about how Mr. Person was treating him in June, September and October 2019.

247.     In each meeting he noted that he was turning 59 and would be eligible for the ERP in April 2020.

248.     Mr. Halevi's behavior constituted protected activity under Title VII.

249.     HR, Mr. Person and other individuals at NPD were aware of his complaints.

250.     NPD interfered with Mr. Halevi's attainment of the ERP, terminated his employment and denied him even the basic severance package, in retaliation for his protected activities, in violation of Title VII.

251.     As discussed *supra*, on February 13, 2020, Mr. Person announced the hiring of Rafael Herrera.

252.     Mr. Halevi was given notice of termination on February 20th, told that "due to a restructuring," his position was eliminated.

253.     The termination, denial of the ERP and denial of at least the standard long-term officer severance package were each an "adverse employment action," resulting from Mr. Halevi's complaints and expressed interest in taking the ERP.

254.     On February 20, 2020, a memo was issued announcing that Mr. Herrera took over Mr. Halevi's role of head of PMO and Business Systems, and Mr. Danziger took over Mr. Halevi's roles as the head of PQM.

255.     Each is younger than him.

256.     Mr. Person is also younger than Mr. Halevi.

257.    Mr. Halevi has been damaged as a result of NPD's conduct and the damage is continuing.

258.    He seeks back pay, front pay, emotional distress damages, punitive damages, attorney's fees and costs and interest.

### COUNT IX
### (Retaliation – New York City Human Rights Law )

259.    Mr. Halevi repeats the preceding allegations as if set forth more fully herein.

260.    Mr. Halevi Mr. Halevi complained to HR about how Mr. Person was treating him in June, September and October 2019.

261.    In each meeting he noted that he was turning 59 and would be eligible for the ERP in April 2020.

262.    Mr. Halevi's behavior constituted protected activity under the New York City Human Rights Law.

263.    HR, Mr. Person and other individuals at NPD were aware of his complaints.

264.    NPD interfered with Mr. Halevi's attainment of the ERP, terminated his employment and denied him even the basic severance package, in retaliation for his protected activities, in violation of Title VII.

265.    As discussed *supra*, on February 13, 2020, Mr. Person announced the hiring of Rafael Herrera.

266.    Mr. Halevi was given notice of termination on February 20th, told that "due to a restructuring," his position was eliminated.

267.    The termination, denial of the ERP and denial of at least the standard long-term officer severance package were each "reasonably likely to deter a person from engaging in

protected activity," resulting from Mr. Halevi's complaints and expressed interest in taking the ERP.

268.     On February 20, 2020, a memo was issued announcing that Mr. Herrera took over Mr. Halevi's role of head of PMO and Business Systems, and Mr. Danziger took over Mr. Halevi's roles as the head of PQM.

269.     Each is younger than him.

270.     Mr. Person is also younger than Mr. Halevi.

271.     Mr. Halevi has been damaged as a result of NPD's conduct and the damage is continuing.

272.     He seeks back pay, front pay, emotional distress damages, punitive damages, attorney's fees and costs and interest.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff Shaul Halevi asks this Court to award judgment in his favor, as follows:

(a) As to the ERISA claims, declaratory and injunctive relief against NPD and the ERP, rendering Mr. Halevi a participant of the Early Retirement Plan, as of April 20, 2020, with full retirement benefits therein.

(b) Alternatively, payment by NPD an amount equal to the full ERP value based as a result of promissory estoppel.

(c) Damages against Tod Johnson for breach of fiduciary duty and promissory estoppel.

(d) In connection with the ADEA and the New York City Human Rights Law, an award of back-pay, front pay, emotional distress damages, punitive damages, attorneys' fees, and costs.

(e) An award of attorneys' fees and costs pursuant to ERISA §1132(g)(1).

(f) An award of pre and post-judgment interest.

## JURY DEMAND

Pursuant to Fed.R.Civ.Pro. 38, plaintiff Shaul Halevi demands a trial by jury on all issues and claims so triable.

Dated:  New York, New York
      April 28, 2020

**LAW OFFICES OF**
**ALISON GREENBERG, LLC**


By:_____
Alison G. Greenberg
116 W. 23rd Street
Fifth Floor
New York, NY 10011
Tel: (646) 375-2039
Fax: (646) 390-2889

*Attorneys for Plaintiff*
*Shaul Halevi*